SECURITY PACIFIC NATIONAL BANK, Plaintiff

v.

THE M/V CONQUEST, Defendant

STAR-KIST SAMOA, Inc., and
STAR-KIST FOODS Inc., Intervenors

High Court of American Samoa
Trial Divison

CA No. 17-84

April 21, 1987

Before REES, Chief Justice, and TAUANU'U, Chief Associate Judge.

Counsel: For the Plaintiff, Roy J.D. Hall Jr. and Daniel Minteer.
For Intervenor Casamar, William Reardon, Robert W. Ayling, and April J. Rodewald
For Intervenor Star-Kist, Togiola T. Tulafono

On May 19, 1981, plaintiff Security Pacific National Bank lent $1.6 million to a corporation formed in order to purchase the M/V Conquest. The loan was secured by a "First Preferred Ship Mortgage," which was properly executed and recorded in Long Beach, California, in accordance with the Ship Mortgage Act, 46 U.S.C. §§ 911 et seq. Plaintiff never received any payments on the loan.

In 1984 plaintiff filed this action to foreclose its mortgage. The action is in rem, and

service was effected by the seizure of the ship in Pago Pago Harbor.

Soon after the seizure of the ship various suppliers of goods and services intervened, claiming maritime liens upon the Conquest and seeking the foreclosure of these liens. The corporation that owned the ship never appeared. Plaintiff moved for summary judgment, claiming that its mortgage had priority over the maritime liens in accordance with the Ship Mortgage Act. The Trial Division of the High Court initially denied summary judgment on the ground that the Act grants exclusive jurisdiction to foreclose preferred mortgages to United States District Courts. See 46 U.S.C. § 951.

On plaintiff's motion for reconsideration, however, the Trial Division reversed itself. The court held that Congress intended only to deprive state courts of jurisdiction to foreclose preferred mortgages. Prior to the passage of the Act in 1920, the federal district courts had exclusive jurisdiction over admiralty cases, including suits for the foreclosure of maritime liens; but since the English common law had treated ship mortgages as "non-maritime contracts," jurisdiction to foreclose them was generally in the state courts. See Bogart v. The Steamboat John Jay, 58 U.S. (17 How.) 399 (1854). Congress enacted the Ship Mortgage Act in order to put an end to this peculiar situation and to create a uniform set of priorities among mortgages and maritime liens throughout the United States, presumably including its territories and possessions. See Smith, Ship Mortgages, 47 Tul. L. Rev. 608 (1973). Accordingly, the High Court held that where there is "lacking a United States district court to exercise its 'exclusive,' 'original' jurisdiction, the mortgage can be foreclosed in any court exercising valid admiralty jurisdiction." Security Pacific National Bank v. M/V Conquest, 4 A.S.R.2d 40, 41 (1985) (per Gardner, C.J.) [hereinafter cited as Conquest I].

Since there is no federal district court in American Samoa, and since the High Court has admiralty jurisdiction,[1] the court foreclosed the

---

1. A.S.C.A. § 3.0208(a)(3) grants the High Court jurisdiction over "admiralty and maritime matters, of which the trial division shall have both in rem and in personam

mortgage. The court also found that one intervenor, Star-Kist, had a preferred maritime lien for crew wages that took priority over plaintiff's mortgage. All other liens (including some others held by Star-Kist) were subordinate to the mortgage.

Over a year later, after the Conquest had been sold and resold,[2] the Appellate Division reversed the trial court's decision. The three-judge appellate panel[3] agreed with Chief Justice Gardner that "the exclusive jurisdiction provision was intended to provide uniform proceedings by removing

---

jurisdiction." This statute was held to be consistent with the United States Constitution and federal statutes in Meaamaile v. American Samoa 550 F. Supp. 1227 (D. Hawaii 1982) (per King, J.). Although the Appellate Division's holding in this case that we do not have jurisdiction to foreclose preferred mortgages under 46 U.S.C. § 951 may seem inconsistent with the federal court's holding in Meaamaile that 28 U.S.C. § 1333 (the general jurisdiction statute) does not deprive us of our admiralty jurisdiction, an examination of the two statutes resolves any such apparent inconsistency. See Rainwater v. The Sea Encounter, CA 96-84, 3 A.S.R.2d 87, 89-90 (1986). Judge King, who decided Meaamaile, was also the author of the Appellate Division's opinion in this case.

2. After summary judgment was granted the ship was sold at a marshal's sale. Notice of the sale was published extensively in the United States' and American Samoa. The plaintiff was the high bidder. At oral argument on remand the court was informed that the ship had been resold.

3. The panel consisted of then-Associate Justice Thomas Murphy, presiding; Judge Samuel P. King of the United States District Court for the District of Hawaii; and Associate Justice Walter M. Heen of the Intermediate Court of Appeals of the State of Hawaii. Judge King and Justice Heen were sitting pro tem as Acting Associate Justices of the High Court.

state jurisdiction over foreclosure actions," and that "the legislative history does not suggest that Congress intended to preclude foreign countries or territories from foreclosing on mortgages." Star-Kist Samoa, Inc., v. The M/V Conquest, AP No. 13-85, slip opinion at 9 (June 25, 1986) [hereinafter cited as Conquest II.] The apparent intention of Congress, however, was classified as a "policy consideration" which the court was precluded from considering. Id. at 8-9. Rather, the appellate panel held that words mean what they say they mean and that the High Court of American Samoa "does not come within the plain meaning of 'district courts of the United States'" in 46 U.S.C. § 951. Conquest II at 4. The Appellate Division therefore remanded to the trial court "to determine the priority of [the] liens and to effect a foreclosure of the ship's mortgage under common law admiralty principles." Id. at 12. This we shall now attempt to do.[4]

_____

[4]. The appellate court assumes that we have jurisdiction to foreclose the mortgage apart from the provisions of the Ship Mortgage Act. We agree, although the question is not as simple as it looks.

Soon after deciding The John Jay, the Supreme Court relaxed the rule of that case by announcing that a mortgage holder could assert his interest by intervention in an admiralty suit brought by holders of maritime liens. Schuchardt v. The Angelique, 60 U.S. (19 How.) 239 (1856). See also The Lottawanna, 88 U.S. (21 Wall.) 558 (1875). Later the Court held that if the holder of a non-maritime claim brings an action over which the admiralty court finds it does not have jurisdiction, but in the meantime there has been a judicial sale to foreclose valid maritime liens, the existence of the maritime liens gives the court jurisdiction. United States v. Rizzo, 297 U.S. 530 (1936). The original plaintiff can then be treated as an intervenor and can be awarded the "surplus proceeds" of the sale after prior liens have been satisfied. See The Angelique, supra; 2 Benedict on Admiralty § 71 (6th ed. 1984). All parties on remand agree that we have jurisdiction.
It is arguable, however, that the language of 46 U.S.C. § 951, granting "exclusive jurisdiction" to the federal courts to foreclose Preferred Ship Mortgages,

63

## I.   Determining The Applicable Law

At the   outset we   must observe that the scope of our assignment   on   remand   is'   far   from clear. Technically there are no such things as "common law admiralty   principles."       Indeed,   the   historic separation between the English courts of common law and of admiralty is what gave   rise to   the problem we are   dealing with.   See   G. Gilmore & C. Black, The   Law   of   Admiralty   § 1-4   (2d   ed.   1975) [hereinafter cited   as Gilmore & Black].   Moreover,

precludes us   not   only   from   entertaining an original action   to foreclose   such a mortgage but also   from foreclosing   it incidentally in the   course   of   foreclosing   valid'   maritime liens.   The "exclusive   jurisdiction" language could also   be read   to deprive the High Court of   the   jurisdiction   it   would   have   in the absence of   the Ship Mortgage Act to foreclose plaintiff's   mortgage ·as   an   ordinary,   non-preferred ship mortgage.   See Part III, infra, at pages 21-22; Part IV, infra, at pages 26-28 & note 9.   We join the Appellate Division and the parties, however, in declining to read .the statute this   way.   Rather, we   hold that the Act did   not   deprive   us   of   jurisdiction to foreclose the underlying contractual mortgage that   the   plaintiff   had   acquired   before he acquired   his   Preferred   Ship ·Mortgage.   See Parts III and IV, infra.

We do note, however,   the absence   of our júrisdiction   to   modify   the   trial   court judgment   with   respect   to   any   intervenors except Star-Kist.   No other party perfected an appeal;   in   fact,   the   Appellate   Division granted intervenor Casamar's motion to dismiss its   own   appeal.   Casamar   has nevertheless filed a   brief and   made oral   argument in the proceedings on remand.   In   our   opinion, the judgment   of   the   trial   court (including the judgment   . that   the   maritime   liens   were subordinate   to   the   mortgage)   became ˎfinal against all parties except those who filed and perfected   their   appeals.   Except   in· rare instances where the   original   proceedings are tainted by fraud or its equivalent, a judgment remains final even though it is later found to be incorrect.   We therefore have jurisdiction to modify the trial court judgment   only among those who were appellants and appellees at the time   the   Appellate   Division   rendered   its judgment.

64

jurisdiction to foreclose a non-maritime mortgage was traditionally in equity rather than at common law. See Bogart v. The Steamboat John Jay, supra. We assume, however, that the Appellate Division was using the term "common law" as a generic term for all non-statutory law. Thus we are to foreclose the ship's mortgage and figure the priority of the liens by reference to whatever law may apply in the absence of jurisdiction under the Ship Mortgage Act.

Plaintiff, the mortgagee, understandably suggests a narrow reading of the appellate decision. Notwithstanding the holding that we have no jurisdiction, under the Ship Mortgage Act, plaintiff urges that the substance of the Act--- in this case 46 U.S.C. § 953, which assigns preferred mortgages priority over all but a few maritime liens --- is binding on us. This solution is appealing not only in its simplicity but also in its consistency with the purpose of the Act. Nor would it violate the mandate of the Appellate Division, for it does not entail the construction of the term "United States District Courts" in the jurisdictional section of the Act (section 951) to include the High Court of American Samoa.

The language of section 953, however, seems to preclude the solution suggested by plaintiff. Instead of simply establishing certain priorities among liens and mortgages, it provides that the statutory priorities come into being only "[u]pon the sale of any mortgaged vessel by order of a district court of the United States." Until that moment, which. in Samoa is a moment that never comes, the ship's mortgage and the maritime liens have whatever priorities they would have had in the absence of the statute. Insofar as we are bound by the directive of the appellate court to interpret the Act so as to give its words their most straightforward meaning rather than in light of their context and apparent purpose, section 953 would seem to be no more applicable than section 951 to proceedings in the High Court.

Intervenors also believe our task to be an easy one. It consists solely in consulting and applying court decisions rendered prior to the enactment of the Ship Mortgage Act in 1920. Under these decisions the holder of a ship's mortgage "sat at the end of the table and received little or nothing." Gilmore and Black § 9-47 at 690.

65

This view, however, misapprehends the role of a common law court. When a judge is dealing with judge-made rules rather than with legislation or a constitution, his task is not to apply old doctrines blindly to facts for which they were never made. The great strength of the common law, in the eyes of some of its most prominent enthusiasts, is not that the rules never change but precisely that they do change as society changes. See, e.g., B. Cardozo, The Nature of the Judicial Process (1921); E. Levi, An Introduction to Legal Reasoning (1949); G. Calabresi, A Common Law for the Age of Statutes (1982).

Nor is the evolution and eventual obsolescence of judge-made rules a peculiar feature of the Anglo-American common law. Although admiralty law borrowed much of its procedure and terminology from the civil law, it consists primarily of a body of judicial decisions. Moreover, although admiralty law is said to have had its beginnings on the Island of Rhodes in 900 B.C., it has changed a bit since then. The law of admiralty has been found to prescribe different rules in different times and places because judges have had to decide, as they always do, which sources and constructions of the law to follow, which to distinguish, and which to disregard. See Gilmore & Black §§ 1-3, 1-4, 9-3, 9-4. As it happens, the very cases on which intervenors rely afford textbook illustrations of this point.

## II. The Law Prior to 1920

### Maritime Liens

"Anglo-American lien law is a 19th century creation." Gilmore & Black § 9-3 at 590. More precisely, it seems to have been created in Maine in 1831. In The Nestor, 18 Fed. Cas. 9 (C.C.D. Me. 1831), Justice Story (sitting as a trial judge rather than as a Supreme Court Justice) held for the first time that a materialman could proceed in rem against the ship although it was not in his possession.

Possessory liens, by which innkeepers, repairmen, and others could retain possession of things until they had been paid for their services in connection with those things, were known to the

66

common law. The only American precedents for the non-possessory maritime lien were in forfeiture cases. In the leading case Chief Justice Marshall (also sitting as a trial judge) had relied on the "personification" of the ship as a reason to allow forfeiture of a ship used in illegal activities without the knowledge or consent of its owner: since the offense had been "committed by the vessel," it was "not unreasonable, that the vessel should be affected." The Little Charles, 26 Fed. Cas. 979 (C.C.D. Va. 1819). A few years later Justice Story had written for the Supreme Court in a forfeiture case; he had found some precedent for the notion of a thing as an offender --- in English revenue cases rather than admiralty cases --- but the Court was divided so the ship went free. The Palmyra, 25 U.S. (12 Wheat.) 1 (1827). In The Nestor, on the other hand, "we find much parade of erudition, with copious citations from the Digest [of the Roman Emperor Justinian] and Continental sources, but no insistence of the ship as 'the offender . . . the guilty instrument or thing.'" Gilmore & Black § 9-4 at 594.[5]

---

5. It does seem to have been the practice in some maritime courts (although not in the admiralty courts of England or the American colonies) to treat certain contracts as creating real rights in the ship. See The Underwriter, 119 F. 713, 714-18 (D. Mass. 1902), and authorities cited therein. This practice seems to have had its basis in a provision of the Digest of Justinian creating a privilege for those who had contributed to the construction of a ship, including those who had lent money for this purpose. Dig. 42, 5, 26, 34, quoted in 119 F. at 714-15. When continental maritime courts expanded this privilege (a mere personal right against the assets of the owner) into a lien (a property right enforceable in rem) they began by requiring an express hypothecation --- that is, a mortgage. Later, hypothecation came to be inferred in certain circumstances, reflecting the master's authority to act for the owner and/or the recognition that the owner would have been willing to pledge the ship as security under those circumstances had he been present. See id. at 715-18. The materialmen's lien, in other words, evolved as a sort of implied ship's mortgage.

Similarly, in the substantive admiralty law of England prior to the writs of

The doctrine of a maritime lien enforceable in rem was not adopted in England until 1852. The Bold Buccleugh, 7 Moore, P.C. 267 (1852). The Privy Council "found no English precedents to rely on and had to content themselves with repeating Justice Story's general language about maritime liens in The Nestor . . . ." Gilmore & Black § 9-6 at 595.

## Ship's Mortgages

The mutability and randomness of the law are similarly demonstrated by the development of the doctrine that admiralty courts had no jurisdiction to foreclose ship's mortgages. In Bogart v. The Steamboat John Jay, supra, the Supreme Court held that federal district courts had no such jurisdiction because the English admiralty courts did not have it. This, in turn, was "because such a jurisdiction had been denied by the jealousy of the courts of the common law." Id., 58 U.S. (17 How.) at 96. This was so not because ship mortgages were thought to be less important than the various transactions that give way to maritime liens, but because the English common law courts considered themselves more important than the admiralty courts. The common law courts had the power to issue writs of prohibition to the admiralty courts; they used this power to develop and enforce an "absurdly narrow" construction of the statutes limiting the admiralty courts' jurisdiction to things done upon the sea, so that "contracts having a maritime subject-matter but made on land (as most were) were held outside the jurisdiction . . . ." Gilmore & Black § 1-4 at 10. "By the end of the seventeenth century, the

prohibition the idea of a lien on the ship was based on an implied hypothecation and, except as the aptness of such an implication varied with particular circumstances, those who repaired and supplied ships were treated no differently than builders, co-owners, or moneylenders. See id. at 720-26. Subsequently, writs of prohibition against admiralty jurisdiction over contracts not "done upon the sea" divested the admiralty courts of in rem jurisdiction over materialmen's liens as well as ship's mortgages. See id. at 726-31; 7A J. Moore, Federal Practice par. .285[1] at 3234, quoted in Part III infra.

68

[Admiralty] court was of little importance . . . ."
Id.

       Accordingly, the early admiralty decisions in the United States generally rejected the narrow limits that had been imposed on English admiralty courts, believing that the statutes on which they were based had no application in the colonies. The general rule adopted was that American admiralty courts had jurisdiction over cases whose <u>subject matter</u> was maritime in character, regardless of whether the contract had been confected on land or sea. <u>See</u> Gilmore & Black § 1-9. In the leading case of <u>De Lovio v. Boit</u>, 7 Fed. Cas. 418, 444 (C.C.D. Mass. 1815), Justice Story stated that the jurisdiction of United States admiralty courts

> comprehends all maritime contracts, torts, and injuries. The latter branch is necessarily bounded by locality; the former extends over all contracts (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations) which relate to the navigation, business or commerce of the sea.

<u>Id.</u> at 444. Justice Story's opinion in <u>De Lovio</u> was endorsed by the Supreme Court in <u>The New England Marine Insurance Co. v. Dunham</u>, 78 U.S. (11 Wall.) 1 (1870):

> This court has frequently declared and decided that the admiralty and maritime jurisdiction of the United States is not limited either by the restraining statutes or the judicial prohibitions of England, but is to be interpreted by a more enlarged view of its essential nature and objects . . . .

       <u>Id.</u> at 7. <u>The John Jay</u>, a two-page opinion that cited no American authority, was thus clearly inconsistent with the principles expounded in <u>De Lovio</u>, <u>Dunham</u>, and numerous other cases for the determination of admiralty jurisdiction in the United States --- particularly including the cases under which materialmen's liens came to be enforceable in rem. If the general admiralty law in the United States had been defined as <u>The John Jay</u> defined it, by the jurisdiction of the English admiralty courts at its narrowest, then neither ship's mortgages nor materialmen's liens would be enforceable, since both are based on contracts

69

invariably made "upon land." If it had been defined by another standard --- by reference either to continental maritime courts or to English admiralty law before the statutory restrictions--- it appears that they would both have been held enforceable. See note 5 _supra_.

It was, in other words, an historical accident that jurisdiction over ship mortgages and maritime liens should have been lodged in separate courts. It might be put down to the single fact that the first maritime lien case was heard by Justice Story, a civil law scholar and a nationalist who believed that broad power in the federal courts was essential for the growth of commerce, whereas the ship mortgage case reached the Supreme Court a few years later when it was preoccupied with other concerns. It was in any case not the result of a principled decision by anyone, English or American, judge or legislator, that people who sell ships should have fewer rights than people who sell supplies to ships.

In 1920 Congress acted to put an end to this situation. Sixty-seven years later it has been discovered that Congress did not quite succeed. In one jurisdiction ship mortgages are still governed by "the general law of admiralty." It falls, therefore, to the courts of that jurisdiction to determine what that law is --- not what it was in 1854 or 1919, but what it is in 1987. As with any case in which a court is confronted with ancient precedents that have fallen into disuse, we must decide whether those cases were similar enough to this one to justify their application or whether new circumstances warrant new rules.

## III. Developments Since 1854

### The Ship Mortgage Act

Since 1854 the world of ship's mortgages has been rocked by two important events. The first of these was the passage of the Ship Mortgage Act. Although, for the reasons we have discussed, the Act neither gives us jurisdiction to foreclose a mortgage nor binds us to the order of priorities it enacted, it remains an important juridical fact in several ways.

First, it indicates the existence of a problem that was important enough for Congress to address. It suggests that the rule of _The John Jay_, in the phrase most often used to justify derogation from

judicial precedent, "has not stood the test of time."

Second, the Act represents an attempt by a body with some claim to expertise in discerning the needs and usages of society to formulate a solution to the problem. Any statute which reflects "a basic change in attitude toward law and toward entitlements generally" necessarily exerts a "gravitational pull" on judicial decisions in related areas; it is "a major development in those principles that must guide the common law courts in their lawmaking." G. Calabresi, supra, at 86. There is abundant precedent for the judicial practice of adopting as judge-made law the substance of statutes that are not binding on the court. For instance, the Uniform Commercial Code does not apply to contracts for the sale of real estate, but some state courts have adopted provisions of the U.C.C. by analogy as rules of property law. Similarly, many state legislatures have adopted comparative negligence statutes; in some other jurisdictions the courts, regarding this new development as a desirable one, have modified the old judge-made law to incorporate comparative negligence.

Finally, even when a court doubts the appropriateness of a new statutory rule it must recognize that such a rule may eventually change people's behavior. This is possible not only in matters to which the rule directly applies but also in related areas. In deciding cases involving multi-jurisdictional transactions, a court must recognize that the reasonable expectations of the parties may have been shaped by the law outside the forum state.

When one rule has been adopted in an overwhelming majority of the jurisdictions with which the forum state has contact, it is quite possible that customs and usages within the forum will change as well. A conflicting judge-made rule, originally fashioned in light of what people within the jurisdiction usually do and expect others to do, will tend to lose its reason for being. This phenomenon has been recognized not only by common law judges but also in the law of nations, where it is generally held that a treaty provision can become binding as a rule of customary law even on nations that did not sign the treaty. When this happens, it is not because the treaty itself has become binding, but because the rule has in fact given rise to a custom.

71

For all these reasons, the enactment of the Ship Mortgage Act and its application for sixty-seven years in the United States and in all but one of its territories and possessions militate strongly against the judicial enforcement of a conflicting set of rules in the one remaining jurisdiction. The Act is, moreover, not the only development that suggests the obsolescence of the rules that prevailed prior to 1920.

### The Unification of Admiralty and Common Law Actions

The other such event is the unification of admiralty procedure with regular civil procedure. Prior to 1966 each federal district court had two "sides," each with its own docket and rules of procedure. This division of one court into two was the major premise of the law with regard to liens and mortgages prior to 1920.

It is important to remember that the holding in The John Jay was jurisdictional rather than substantive: the Court did not hold that mortgages ought to be subordinate to materialmen's liens, but only that they must be foreclosed in different courts. The priorities emerged only because admiralty judges were more willing than common law judges to develop creative remedies. (In this respect the situation was almost exactly the opposite of that which had prevailed in England several centuries earlier, when the jurisdictional division perpetuated in The John Jay was first devised.) Since admiralty courts had personified the ship and determined that maritime liens "attached" to it, they followed it even after a common law court had foreclosed the mortgage; since common law courts continued to regard the ship as no more than an ordinary piece of personal property, the lien created by a mortgage did not survive a foreclosure of other liens. Even if the coexistence of these contradictory approaches had not been ended by the Ship Mortgage Act, its jurisdictional basis would have been undercut by the unification of common law and admiralty.

This is not to say, of course, that unification must inevitably have led the federal courts to treat ships similarly for the purposes of mortgages and of maritime liens, but only that in a unified system it would have been more difficult for courts to avoid coming to terms with the disparity. If a case such as The John Jay had been

72

brought not by a "libel" but by a civil complaint alleging both admiralty jurisdiction and diversity of citizenship, the federal court would have had jurisdiction regardless of whether the mortgage was classified as "maritime" or "non-maritime." If materialmen had intervened in the same case to assert their liens, the court would have been hard pressed to characterize the ship (vis a vis the mortgagee) as an ordinary piece of personal property to which obligations do not attach, and at the same time (vis a vis the materialmen) as a quasi-person festooned with immutable liens.

If the case had not arisen until after 1938, deference to state law with regard to the "non-maritime" part of the case might conceivably have required such asymmetrical reasoning. See Erie R.R. v. Tompkins, 304 U.S. 64 (1938). In fact, however, The John Jay and the maritime lien cases arose at a time when the federal courts did not hesitate to expound their own version of the common law even when it required them to contradict or overrule the state courts. See Swift v. Tyson, 41 U.S. (16 Pet.) 1 (1842). If during this period a federal court had been confronted with a case in which it clearly had jurisdiction to foreclose both a ship's mortgage and materialmen's liens, it might well have decided as a court of common law and equity to recognize a non-possessory lien in favor of the holder of a ship's mortgage (perhaps looking for precedent to the revenue cases cited by Justice Story in The Palmyra). Confronted with two rights of equal jurisprudential dignity, the court would then have proceeded to consider such factors as the expectations of the parties and the needs of maritime commerce in order to develop a fair and rational set of priorities.[6] And if the Supreme

---

6. The doctrine that "maritime" liens necessarily take priority over those classified as "non-maritime" liens seems to have emerged (with little or no analysis) as a corollary of the limited jurisdiction of admiralty courts rather than because of considerations having to do with the nature of the particular liens in question. See The J.E. Rumbell, 148 U.S. 1 (1893) ("An ordinary mortgage of a vessel . . . is not a maritime contract. A court of admiralty, therefore, has no jurisdiction of a libel to foreclose it . . . . But it has jurisdiction, after a vessel has been sold by its owner, and the proceeds have been paid into the registry, to

Court had been confronted with such a case after its decision in _Erie_, it might have noticed the awkwardness of regarding a transaction whose whole purpose and effect is to put a vessel on the high seas as a "non-maritime" matter to be regulated exclusively by state law.[7]

---

pass upon the claim of the mortgagee, as of any other person, to the fund . . . . ."). In other words, the non-maritime claimant was paid last because the court's jurisdiction to pay him did not commence until the maritime claimants had been paid. Nor does the priority of maritime over non-maritime liens flow inexorably from the supremacy of federal over state law. Indeed, the maritime lien in _The J.E. Rumbell_ was created by a state statute, whereas according to the prevailing theory of the time the common law of contract (on which the mortgagee's right would have been based) was "general" and "federal." _See Swift v. Tyson_, _supra_.

[7]. _Cf._ Gilmore & Black § 9-57 at 719 (footnotes omitted):

Under the doctrine of Swift v. Tyson the federal courts, for nearly a century exercised an independent judgment on matters of general commercial law. What the Swift v. Tyson doctrine meant in practice was that the federal judges, in situations where competing and conflicting rules had developed on the state law level, chose what seemed to them the better rule. The announcement of a federal rule, particularly when the announcement was made in a well-reasoned opinion by the Supreme Court, frequently served to bring the conflict and controversy to an end. Over a long period of time the sort of federal synthesis of conflicting state rules which Swift v. Tyson led to did a great deal to ensure national uniformity over a broad area of the substantive law.

## Jurisprudential Developments

Nor did these changes in the law occur in a vacuum. The same social and economic developments that gave rise to the Ship Mortgage Act, and the same dissatisfaction with asymmetry and anachronism that motivated the unification of common law and admiralty, brought wholesale changes in the jurisprudence of interstate and foreign commerce. During the first part of this century the United States Supreme Court had occasion to reconsider and reverse a number of its Nineteenth Century holdings on matters related or analogous to the ship mortgage question.

The rule of _The John Jay_ --- that a ship mortgage is non-maritime because the ship has not yet been put in the water at the time it is made--- bears a remarkable resemblance to the holding in _United States v. E.C. Knight Co._, 156 U.S. 1 (1895). That case was an antitrust action against a company that had cornered the market on sugar. Its refineries were located throughout the nation and produced 98% of the sugar refined in the United States. Although acknowledging that "[d]oubtless the power to control the manufacture of a given thing involves in a certain sense the control of its disposition," the Court held that "[c]ommerce succeeds to manufacture, and is not a part of it." The power to regulate interstate manufacturing combinations was therefore not within the

---

The Court's decision in _Erie_, by eliminating the role of the federal courts in bringing uniformity to the law even in areas constitutionally committed to the states, made it far more important that matters properly within the federal jurisdiction be so characterized. _See_ Gilmore & Black § 9-57 at 720-27. At the time _The John Jay_ was decided, in other words, it did not present nearly the threat to maritime commerce that it would have posed after _Erie_ if the Ship Mortgage Act had not intervened. The waning of _Swift v. Tyson_ must therefore be tallied as yet another changed circumstance which might have forced a judicial reversal of _The John Jay_ even if Congress had not reversed it by statute--- and which therefore militates against its present application in a jurisdiction where the statute does not apply.

constitutional power to regulate interstate commerce.

In 1937, however, the Court announced the abandonment of this metaphysical division of the world into things that were and were not "in commerce." Although an activity "when separately viewed" might seem "local," a "close and intimate effect" on interstate commerce would bring the activity within the commerce power. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1 (1937).

The passage of the Ship Mortgage Act made judicial reconsideration of the analogous holding in The John Jay unnecessary. It also arrested the development of the law in those few cases in which the federal courts have been faced with ship mortgages that were not "preferred" within the definition of the Act. In McCorkle v. First Pennsylvania Banking and Trust Co., 459 F.2d 243 (4th Cir. 1972), the court dismissed an action by the holder of a mortgage that had not complied with the rules of 46 U.S.C. § 911 et seq. for the registration of a preferred mortgage. Although the court was highly critical of the rule of The John Jay, it felt bound by a dictum in Detroit Trust Co. v. The Thomas Barlum, 293 U.S. 21 (1934) to the effect that "[i]f the mortgage is a preferred mortgage within the definition of the Act, jurisdiction is granted; otherwise not." Id. at 33. The Supreme Court in The Barlum, in turn, had relied on a broad view of congressional power to define the admiralty jurisdiction of the federal courts. See id., 293 U.S. at 48.

The decisions in McCorkle and The Barlum were attempts to define the scope of jurisdiction granted to the federal district courts by Congress in the Ship Mortgage Act. As such, they seem clearly correct. Since Congress could have given the federal courts jurisdiction over all ship's mortgages, but chose instead to enact a detailed scheme involving the weight of the ship, the place of registry, the citizenship of the mortgagee, and numerous other factors, it must have intended jurisdiction of all mortgages falling outside the statute to remain outside the admiralty courts. Even if the courts had come to believe subsequent to the passage of the Act that The John Jay was wrongly decided, it would have been improper for them to take jurisdiction over a mortgage which Congress clearly intended to leave outside their jurisdiction.

If Congress had made a similar rule with regard to the treatment of ship mortgages in the High Court of American Samoa --- either that they should be entirely outside our jurisdiction or that we should give them some particular priority in relation to maritime liens --- we would of course be bound by that rule. With respect to American Samoa, however, Congress apparently gave the matter no consideration and made no rule. The evidence of the general purpose of the Act suggests that if Congress had adverted to the Samoan question it probably would have meant for preferred mortgages to be enforceable here, and to take priority over ordinary maritime liens. See Conquest II at 5, 9-10. Unfortunately, the "plain language" of the statute, although probably intended only to exclude state court jurisdiction, also seems to exclude the High Court of American Samoa. See Conquest II at 4, 6, 10. This means we have no jurisdiction to foreclose preferred mortgages under the Act. For us to go further, and to find that Congress inadvertently deprived us of the jurisdiction we would otherwise have had as a court of general admiralty, common law, and equity jurisdiction--- or, as Intervenors suggest, that Congress inadvertently bound us to follow the very rule it was attempting to abolish with respect to priorities --- is required neither by the holdings in McCorkle and The Thomas Barlum nor by the "plain language" of the Ship Mortgage Act. The principal relevance of the post-1920 jurisprudence to this proceeding is the support it lends to the view that the courts would have overruled The John Jay if Congress had not got there first. Drawing extensively from a work by a leading authority on federal jurisdiction, the McCorkle court suggests that

the pre-1920 general exclusion of ship mortgages from admiralty was merely an uncritical adoption of the English law as it existed in 1776. Since the jurisdiction of American admiralty courts has always been recognized to depend on the nature of the case and not the peculiarly limited rules of English law, Insurance Co. v. Dunham . . . Professor Moore maintains that the Supreme Court's unreasoned adoption of the English approach and its continuing adherence thereto is unwarranted. . . .

77

> Moore argues that the English rule in the Eighteenth Century was based not upon logic or maritime principles, but was instead Parliament's political solution to jealousies existing between the English law courts and the English admiralty. . . . Significantly, Moore notes that at one time, before the American revolution, the English admiralty courts did take cognizance of ship mortgages; later, Parliament removed that jurisdiction from admiralty. . . . Ironically, our federal courts still feel the effects of the now discarded limitation. In the final analysis, argues Moore: "What is controlling is simply whether marine mortgages are contracts which further and are inseparably intertwined with maritime commerce and navigation."

459 F.2d at 248-49, quoting 7a J. Moore, Federal Practice par. .285[1] at 3234. See also 2 Benedict on Admiralty § 71 at 6-6.

In sum, the rule of The John Jay was an embarrassment. It was inconsistent from the beginning with the general admiralty law; economic, social, and jurisprudential developments since 1854 have made it even more so; it has been abolished by statute everywhere but in American Samoa; and if the federal courts had not been thus deprived of the opportunity, our best estimate is that they would eventually have overruled the case themselves. We should not apply it unless we are somehow compelled to do so.

## IV. Arguments for Applying the pre-1920 Law

### Judicial Authority

There are several reasons why a court might feel bound, in law or in justice, to apply a rule that it would otherwise believe to be incorrect or inapplicable to the case before it. The reason most frequently given is deference to the authority of a higher court.

For the reasons we have given, we do not feel bound to apply the rule in The John Jay. It is generally recognized that when a precedent is so old and so bad and so infrequently consulted that there is an excellent chance it would no longer be followed if it were to come before the court that

78

decided it, a lower court may choose to anticipate the new rule rather than to perpetuate the old one. We find ourselves in roughly the position of a state or territorial court confronted with a segregation statute fifty years after the Supreme Court's decision in <u>Plessy v. Ferguson</u>, 163 U.S. 537 (1896), which upheld "separate but equal" facilities, and shortly before <u>Brown v. Board of Education</u>, 347 U.S. 483 (1954), which effectively overruled <u>Plessy</u>. The analogy overstates, of course, the moral dimension of this case; but we believe it to be an accurate account of the state of the law.

Nor do we believe that the mandate of the Appellate Division, which directed us to "effect a foreclosure of the ship's mortgage under common law admiralty principles," binds us to do anything but to exercise our best judgment in deciding the case according to the general law of admiralty, the common law, and equity. The Appellate Division seemed to feel that the result originally reached by the trial court was the correct one, but that the route by which this result was reached --- the exercise of jurisdiction under the Ship Mortgage Act --- was not available. <u>Conquest II</u> at 6-10. If our exposition of the non-statutory law leads us to the same result the trial court reached in <u>Conquest I</u>, we may succeed in satisfying not only the appellate court's mandate also its view of where justice lies.[8]

---

8. The only thing that might lead us to doubt this is the appellate division's remark that "the best way to get rid of a bad situation is to make it worse." <u>Conquest II</u> at 11. This seems rather an odd thing to say for a court that has just got through eschewing "policy considerations." <u>See id</u>. at 6-10. We assume that this remark was dictum and that the appellate court did not wish, assuming that a good result can be reached in accordance with law, that we should reach a bad one anyway in order to force Congress to act. We concur, however, in the appellate court's suggestion that Congress should act as soon as possible to clarify the scope of our jurisdiction on this and other matters.

Intervenors may, of course, appeal this decision to the Appellate Division. After that they may pursue a ruling from the United States Supreme Court on whether the 1854 holding in <u>The John Jay</u> is still "good law,"

## Deference to Legislative Will

We would also feel bound to apply the pre-1920 law if we believed that we were required to do so by an act of Congress or of the territorial legislature --- either by the "plain language" or by the apparent intention of those who enacted the statute. Again, this does not seem to be the case. The territorial statutes give us jurisdiction of all admiralty cases with no restrictions whatever. A.S.C.A. § 3.0208, quoted in note 1 supra. The Ship Mortgage Act, as we have tried to show, does not divest us of this jurisdiction. Rather, it creates something called a Preferred Ship Mortgage and gives exclusive jurisdiction to the United States District Courts to foreclose these.

A mortgage is not a piece of paper but a right --- a real right or a personal right, depending on whether or not one agrees with the reasoning of The John Jay. It arises by contract in accordance with laws other than the Ship Mortgage Act. A mortgagee who undertakes to register his mortgage in accordance with the Act may acquire a "Preferred Ship Mortgage." This is a sort of certificate that enables the holder to foreclose in federal court

---

although it is not clear just how to do so. In the absence of any statutory rule to the contrary, it is arguable that the United States Supreme Court has the power to review, by writ of certiorari or otherwise, a final judgment of the Appellate Division of the High Court on a question of federal law. See U.S. Constitution art. III § 2 ("The judicial power shall extend to all Cases, in Law and Equity, arising under . . . the Laws of the United States . . . . In all [such] Cases . . . the supreme court shall have appellate jurisdiction, both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make."); cf. King v. Morton, 520 F. 2d 1140, 1143-44 n.4 (D.C. Cir. 1975) (reserving judgment on this question). Alternatively, dissatisfied parties may choose a creative and circuitous route to the Supreme Court via the Secretary of the Interior and the district and circuit courts in Washington D.C., for which there is no visible authority in the statutes or constitutions of the United States or American Samoa, but which did work once. See King v. Morton, supra.

and to have priority over ordinary maritime liens. There is nothing in the Act that divests the holder of a Preferred Ship Mortgage of his underlying contractual right and the remedies it carries with it.

One remedy which the mortgagee would have in the absence of the Act is to file a civil action in the High Court of American Samoa to foreclose his mortgage (the contractual right, not the piece of paper) as an ordinary, non-preferred ship's mortgage. (Since the High Court rules, like the federal rules, provide for unified civil and admiralty procedure, the mortgagee has this right regardless of whether the mortgage is within our admiralty, common law, or equity jurisdiction.) Although the real or personal right is the same one that underlies his "Preferred Ship Mortgage," the former exists before the latter and is not extinguished by it. To assert the underlying right --- not the Preferred Ship Mortgage itself --- as the basis for a proceeding in a place where there is no federal district court surely does not violate the exclusive jurisdiction of the federal district courts to foreclose the Preferred Ship Mortgage.

The contrary result --- under which American Samoa is established as a sanctuary for defalcating shipowners unless the mortgagor was lucky enough to omit some formality in the registration of his Preferred Ship Mortgage, in which case he can still foreclose on the ordinary mortgage --- is absurd. It is not required by the language of the Act (which does not in terms divest holders of Preferred Ship Mortgages of the remedies they would have had to enforce their underlying contractual rights[9]) and it is contrary to everything we know

---

9. As far as we know, nobody who has a Preferred Ship Mortgage has ever attempted to use the underlying right that gave rise to it as a basis for foreclosing an ordinary mortgage in a place where there is a federal district court. This would be quite disadvantageous to the mortgagee. If it were nevertheless attempted, it might well violate the exclusive jurisdiction provision of the Ship Mortgage Act. This would be true not because of the "plain language" of the Act, but because of what is known about its purpose. For the reasons given in the text, there is nothing incoherent about the

about the intentions of Congress in enacting the Ship Mortgage Act.

### Settled Expectations

A court may also shrink from changing a settled rule, even when it believes another rule to be better on its abstract merits, out of reluctance to penalize people who have ordered their affairs in the expectation that the old rule would continue to be enforced. In this case no such argument can be advanced for following (or, more accurately, reviving) the rule of The John Jay. On the contrary, respect for settled expectations militates in favor of the application of a rule similar to that which has been followed throughout the United States for sixty-seven years, and in American Samoa ever since the first purse seiner defaulted.

Every transaction leading up to this case occurred in a jurisdiction where the Ship Mortgage Act was enforceable (California, Washington, Guam) or was thought to be enforceable (American Samoa). To apply a contrary rule would supply a windfall to those who had every reason to believe their claims would be subordinate to the ship's mortgage. It would also punish those who provided $1.6 million in the then-reasonable belief, the very belief Congress wanted them to have when it passed the Ship Mortgage Act, that their security was good.

---

existence of a contractual right that carries with it both an ordinary ship's mortgage that can be foreclosed anywhere and the right to go through certain formalities and thereby obtain a Preferred Ship's Mortgage which can only be foreclosed in federal court. Because one of the purposes of the Act was to achieve uniformity in the law, however, an inference can be drawn that Congress would have intended (if it had adverted to the prospect of somebody trying to foreclose the underlying right in state court) to divest the state court of such jurisdiction. No such inference should be drawn where there is no federal district court, since the policy of uniformity --- as well as every other policy relevant to the idea of a mortgage --- is actively disserved by making the underlying right unenforceable.

This raises the related question of uniformity. If we were to revive the rule of _The John Jay_ we would apparently be the only jurisdiction anywhere in the world in which that rule applies. All fifty states and every United States commonwealth and territory but this one have federal district courts in which preferred mortgages are given priority over ordinary maritime liens. In every foreign nation where a case has been called to our attention, the priorities prescribed in the Ship Mortgage Act have been respected. See _Conquest I_, 2 A.S.R.2d at 41, and authorities cited therein. (The Appellate Division observes that such assumptions of jurisdiction are "under treaties or principles of comity." _Conquest II_ at 10. But "comity" is another way of saying that the foreign court was doing as it believed Congress would have wished it to do, notwithstanding the "exclusive jurisdiction" language in 46 U.S.C. § 951.) A concern for uniformity in maritime matters --- the touchstone of the quest for a "general" law of admiralty that sent Justice Story and the others to Rhodes and Justinian's Digest in the first place --- militates strongly in favor of the application of a rule similar to that of the Ship Mortgage Act provided that it is within this court's power to apply such a rule.

## V. Conclusion

Accordingly, we hold that plaintiff's ship mortgage was a maritime contract that created a property right in the ship, carrying with it the remedy of foreclosure in the High Court of American Samoa. We further hold that such a mortgage takes priority over ordinary maritime liens but is subordinate to preferred maritime liens (in this case the lien for crew wages).

Out of concern for uniformity, settled expectations, deference to Congress, and the possible implications of federal jurisprudence with regard to non-preferred mortgages, we limit our holding to mortgages that would qualify as preferred under the Ship Mortgage Act. In an action in the High Court involving a ship mortgage and maritime liens, the former will have the same priority it would have in accordance with 46 U.S.C. § 953 if it were foreclosed in a federal district court. We reiterate, however, that such an action will not be "under" the Ship Mortgage Act but will be within the general admiralty and equity jurisdiction of the High Court.

Finally, we must recognize the possibility that an appellate court might disagree with our holding and remand the case for further proceedings. In the hope of averting Conquest V and Conquest VI, we suggest the following alternative basis for the result in this case: In any action for the foreclosure of maritime liens, the holder of a ship's mortgage may intervene to assert his interest. See The Angelique, supra; The Lottawanna, supra; 2 Benedict on Admiralty § 71. In order to avoid unjust enrichment, the proceeds of the sale will be subject to a constructive trust in favor of the mortgagee if his mortgage would qualify as preferred under the Ship Mortgage Act. No lienholder whose lien would be subordinate to the mortgage if foreclosed in a United States District Court may recover from the proceeds of the sale until the mortgage has been paid in full.

This alternative holding has the disadvantage of applying only in cases where the lienholder brings the action or, as in this case, intervenes to give the court admiralty jurisdiction. It entails neither an assertion of admiralty jurisdiction to foreclose a ship's mortgage nor a dramatic departure from traditional equity jurisprudence. Admiralty courts have long enforced the principles of equity in cases within their jurisdiction, including equitable limitations on recovery of money to which a party is otherwise entitled. See The Lottawanna, supra, 88 U.S. at 582-83; Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A., 339 U.S. 684, 691-92 (1950); Gilmore & Black § 1-14. For all the reasons we have stated, a libellant is unjustly enriched when he acquires a priority higher than that prescribed by statute merely because he happens to find the ship in a port where there is no federal district court.

Since we find that the mortgage has the priority accorded it by the trial court in Conquest I, and since the Appellate Division expressly affirmed the trial court's findings on the priority of the liens, the judgment of the trial court will be reinstated.